## THE OPEN HEARTH STEEL FURNACE CO. v. YOUNGSTOWN SHEET & TUBE CO.

(District Court, N. D. Ohio, E. D.  March 24, 1924.)

No. 530.

Patents ⊛⇒328—1,220,444, for improvement in basic open hearth furnaces, held not infringed.

The Naismith patent, No. 1,220,444, for improvements in basic open hearth furnaces, specifically for improved means for preventing the basic and acid linings from fluxing or uniting by placing a water cooler in the walls, as limited by the prior art, *held* not infringed as to claims 1, 2, 5, and 8.

In Equity.  Suit by the Open Hearth Steel Furance Company against the Youngstown Sheet and Tube Company.  Decree for defendant.

Clarence J. Loftus, of Chicago, Ill., and Wm. L. Day, of Cleveland, Ohio, for plaintiff.

L. A. Manchester, of Youngstown, Ohio, Hull, Smith, Brock & West, of Cleveland, Ohio, and Bakewell, Byrnes & Stibbins, of Pittsburgh, Pa., for defendant.

WESTENHAVER, District Judge.  This is the usual patent infringement suit.  The bill charges infringement of United States letters patent 1,220,444, issued March 27, 1917, to S. Naismith, and by him assigned to plaintiff.  Claims 1, 2, 5, and 8 only are in issue.  The defenses are noninfringement and invalidity for want of novelty and because of anticipation.

My study of this case brings me to the conclusion that the charge of infringement is not sustained, and that the bill should be dismissed on this ground alone.  In view of this conclusion, the issues should and will be considered solely from that point of view.

Naismith's invention generally is for certain improvements in basic open hearth furnaces, more particularly basic open hearth and reheating furnaces used for metallurgical purposes.  Specifically, its objects are a new and useful improvement for the preservation of the slag line, means for supporting the furnace walls adjacent thereto, and improved means to prevent the basic and acid linings of the furnace from fluxing or uniting.

Basic open hearth furnaces are usually constructed in the manner described in the Naismith patent.  The hearth is made up, first, of a bottom layer of second-grade brick, next a middle layer of first-grade brick, and then a layer of magnesite brick.

The side walls above the magnesite brick, and the roof, are usually constructed of acid material, usually silica brick.  Interposed between the silica and magnesite brick is a neutral joint of passive material, usually chrome brick or chrome ore, to retard, if not able to prevent, the fluxing of the acid brick, which, when fluxed, runs down and tends to destroy and cut away the magnesite brick, supporting the side wall and roof.

The source of supply of magnesite and chrome brick has been certain mines in Austria.  Both are high-priced, and during the war were difficult to obtain.  The hearth is provided with a substantial lining of basic material, either magnesite or burnt dolomite, and in practice this lining or bank is usually carried above the neutral joint.  That part of the furnace at and near this neutral joint is known as the slag line, or slag zone, and the bank of magnesite or burnt dolomite is for the purpose of protecting the neutral joint against destruction by the fluxing of the silica brick, as well as protecting the bottom of the hearth.  The lower level of the slag zone is usually in line with the sill of the furnace doors, and the zone varies in width, owing to the manner of charging the furnace.

The most destructive effect from the fluxing of the silica brick is said to be at the slag zone.  The difficulties in preserving the furnace at this zone against this action are

probably exaggerated in Naismith's patent and in his testimony, but there is a substantial agreement that the greatest trouble was here experienced, and that the furnace walls, particularly the back wall, sometimes collapsed, owing to the eating away by the acid material of the supporting magnesite brick, and also that the magnesite or dolomite bank at the slag zone must be frequently fettled, repaired, and banked.

Naismith's specifications describe a complete open hearth furnace. His invention has several objects. One is to provide a water cooler to serve as a neutral joint between the magnesite and silica brick, in place of the joint of chrome brick or chrome ore, and to protect the bank and magnesite brick wall from the destructive action of the acid material. In his specifications and drawings, this water cooler is rectangular in shape, about 4 inches wide and 18 inches high; this height being the substantial width of the slag zone. In the drawings the water cooler is shown set upright at a slight angle next to the bank of magnesite or burnt dolomite. In the specifications and claims it is described as set in towards the interior of the furnace, so as to be adjacent to the lining or banks. Other objects of the invention are to provide a water cooler easily detachable and removable, and supports for the side walls and roof of silica brick, without resting the weight thereof on the supporting cooler or the magnesite hearth walls.

To accomplish these objects an angle iron is interposed above the cooler, and supported on the buckstays of the furnace to carry the side walls, and the cooler is constructed and attached in sections, so that one may be easily removed and renewed without taking down the furnace walls. The benefits thereby obtained, he claims, are that the chrome joint and part of the magnesite brick wall are eliminated, as the water cooler serves as a neutral joint for the approximate slag zone area; that the basic and acid materials are kept cool at the point of greatest destructive action, and prevented from fluxing, and the acid material from running down into and destroying the basic material, particularly the magnesite brick wall; that the weight of the silica walls and roof are carried on the buckstays, thereby relieving the basic bank and earth of its weight, and preserving the same as a base for rebuilding the silica side walls; and that the water coolers placed immediately below the supporting angle irons are made detachable,

so that if one gives way it can be readily and quickly removed and replaced, without shutting off the gas or allowing the heated steel to become chilled.

Naismith's invention, defendant contends, must, in view of the prior patent art and prior uses hereafter to be stated, inhere in his specific organization and combination of these elements, and not in the broad idea of placing a water cooler in the side or back walls of an open hearth furnace for cooling purposes, whether above or in the slag zone.

Defendant adopted its present construction in 1917. This construction consists of three sections of flattened pipe, placed in the three middle bays of the back wall between the buckstays. Each section is 5 feet 8 inches long, about 4 inches, or the thickness of one layer of brick, in height, and about 17 to 18 inches in width. The sections are laid flat, and each one projects 4 or 5 inches outwardly beyond the wall, and extends inwardly only part way through the wall, leaving 4½ inches of magnesite brick between the inner end and the inside of the furnace. They are located in the magnesite hearth wall, and, defendant contends, above, and not within, the normal slag zone. A layer of magnesite brick is placed above the coolers, and a layer of chrome brick or chrome ore, in compliance with the prior practice, as described by Naismith, is interposed as a neutral joint between the silica and magnesite brick. The silica brick side walls and roof rest upon and are carried by the magnesite wall, and are not supported by angle irons attached to the buckstays. The coolers are not made detachable and readily removable, so that if one gives way it can be removed and replaced, without the necessity of shutting off the gas or allowing the heated steel to become chilled. This construction, defendant contends, does not infringe the four claims in issue.

Defendant has produced evidence tending to show that its present construction is an evolution of its prior practices, beginning as early as the summer of 1913. This testimony was taken before me in open court. Applying to this testimony the usual rule, that clear and explicit evidence must be produced to establish a prior use, I see no reason to doubt that defendant did what it claims to have done, as testified by numerous witnesses and supported by substantial documentary evidence and memoranda.

Its first construction, installed in the summer of 1913, consisted of a 2½-inch U-shaped pipe placed in the middle bay of the

back wall, between the buckstays and extending inwardly about halfway through the wall. The next form, installed in the latter, part of 1913, consisted of two pipes, one inside the other and prolonged, so as to embrace the two middle buckstays of the back wall. The third development was a three-pipe form of cooler, installed in 1914, the longest of which encircled four buckstays of the back wall. In the latter part of 1914, still another form was adopted, consisting of four pipes, embracing the four buckstays of the back wall. All of these cooling devices were constructed in the magnesite brick wall, with a layer of magnesite brick above them, with a course of magnesite brick between them and the interior of the furnace, and with a chrome neutral joint between the magnesite brick and the silica brick side wall. In brief, except as to the form of the cooling devices, the construction was the same as that adopted in 1917 and now used.

Many patents are cited and relied on as showing the prior art. Naismith's patent application was filed April 17, 1916. The first furnace embodying his invention was constructed in October, 1915. This construction differs from his patent drawings, in that the coolers are not set next to the magnesite or burnt dolomite bank, but a row of magnesite brick approximately 4 inches in width is interposed. Naismith, it appears, had conceived his ideas as early as 1908, but had not reduced them to practice until in October, 1915. No sufficient explanation of the delay in reducing the same to practice, or in filing an application earlier for a patent, is furnished; hence October, 1915, must be taken as his earliest invention date, and patents and uses antedating that date must be regarded as prior art.

A large number of patents were cited in the Patent Office against Naismith's original application. Most of these relate to the mechanical features of his invention, rather than to the cooling device, and are therefore not material to the present discussion. As applicable to the cooling device, there were cited Canavan patent, No. 285,462, Thorndyke patent, No. 29,899, and A. Ramen patent, No. 1,051,634. All of these show some form of water-cooling device interposed in some part of the side walls and roof of an open hearth furnace. The claims were first rejected. In argument these patents were distinguished, because not calling for a water cooler to serve as a neutral joint between the magnesite and silica brick walls, and because located ei-

ther in the roof or in the side walls above the slag zone.

Upon this hearing a number of additional patents are cited, none of which seems to have been discovered by the Patent Examiners. Of these, the three most pertinent are United States letters patent No. 919,027, issued to L. L. Knox April 20, 1909; United States letters patent No. 691,297, issued to Smith & Bedford January 14, 1902; and United States letters patent No. 589,210, issued to B. Hall August 31, 1897.

The Knox patent relates to open hearth furnaces, as well as smelting and heating furnaces. It is designed, he says, to provide means for protecting the furnace, or such parts thereof as may be necessary, from the more or less rapid destruction which ordinarily takes place in such furnaces. His invention provides as such means water coolers installed in various portions of the furnace walls, which he regarded as most subject to such destructive action. These coolers are placed in the brickwork of the furnace at the parts thus to be protected. The drawings and specifications show a series of five rectangular shaped hollow water cooling boxes or castings, about the depth of one layer of brick, and, when laid flat, extending from the outside of the wall, about half way through it. The lowest of these coolers is apparently interposed at the joint between the magnesite and silica brick and in the slag zone. They are also designed to be removed and renewed readily in the event any one should be burned out.

The Smith & Bedford patent is also in the open hearth furnace art. It has for its object the division of the hearth containing the charge of metal into two or more compartments. The drawings disclose in each side wall in the slag zone rectangular coolers set upright, of substantially the same shape and form as in Naismith's patent. An optional water cooler of the same form is provided under the bank, dividing the hearth into two compartments. It is said: "The furnace is provided with the usual charging doors d and the usual water boshes or air boxes e for cooling the hearth." It is significant that as early as February 12, 1901, the date of this application, water boshes, installed in these positions for cooling purposes, were regarded as an established part of the open hearth furnace art.

Hall's patent is in the smelting and refining furnace art, a clearly analogous, if not identical, art. It says: "A line of water pipes $K$ along the level of the matte keeps

a certain temperature along this line, which prevents the lining of the furnace from being entirely destroyed by the slag." The matte line, as referred to therein, is the substantial equivalent of the slag line of the open hearth furnace.

Defendant also relies on certain prior uses in other open hearth furnaces, namely, at the plant of the Pennsylvania Steel Company, of the Maryland Steel Company, of the Harrisburg Pipe & Pipe Bending Company, of the Illinois Steel Company, Gary, Ind., of the Carnegie Steel Company, Youngstown, Ohio, of Jones & Laughlin, South Side Works, Pittsburgh, Pa., and of Carnegie Steel Company, Homestead Works, Homestead, Pa. The existence of these prior uses is disputed by plaintiff, on the ground that they are not proved by clear and convincing evidence, as is required by the familiar rule, and because, if proved, they are to be regarded as abandoned experiments. If each one of them stood alone, and if there did not exist the prior patent art already referred to, a careful scrutiny of the evidence tending to establish these prior uses might be necessary.

In view, however, of their large number, and their striking similarity with the prior patent art, the proof offered induces a firm conviction that what the witnesses say was done at these several plants is the fact, and, even if they are to be regarded as abandoned experiments, rather than discontinued inventions, they should not be denied a place in the open hearth furnace art. Each will be considered as a part thereof.

The Pennsylvania Steel Company's construction was installed in 1909 and used for approximately eight months, and then discontinued, as some witnesses say, because of water trouble. Each cooler was 4 feet long, 4 inches high, and 13 inches wide. They were four in number, two located in the back wall, and two in the front wall, between the charging doors. They were placed between the silica and magnesite brick extending from the outer face of the wall inwardly, with a row of silica brick interposed between the inner end and the inside of the furnace. The witnesses testify that they were located at the slag line, and, in any event, if above the normal line, were apparently within the slag zone.

The Maryland Steel Company's construction was installed in 1910 or 1911, used for one year, and then discontinued, because, as some witnesses testify, of water trouble, due to the use of ocean salt water. They

were only two in number, and installed in the front wall, between the charging doors, and located at the joint between the magnesite and silica brick. The open hearth furnaces in which they were thus installed were of the tilting type, and six in number. These cooling devices also were located in the slag zone, with a row of silica brick interposed between the inner end and the inside of the furnace.

The Harrisburg Pipe & Pipe Bending Company's construction was of the Knox cooler vertical type, substantially like that disclosed in Knox patents, 919,189 and 919,-190. The first installation was in 1908, and was thereafter used in a number of furnaces continuously until 1914. They were U-shaped, made first of bronze, and later of welded steel. The bottom leg was placed between the silica and magnesite brick walls along the line of the slag zone.

The Illinois Steel Company, Gary, Ind., construction was first installed in 1910. Similar constructions were later installed in 1913, again in 1914–15, and still later in 1919–20, in other shops. They were not continuously used, but at intervals, as stated. These cooling devices were made of 8 or 10 inch pipe, flattened to 4 or 5 inches in thickness. They were placed in the back walls at the slag zone between the magnesite and silica brick, with a row of magnesite brick between their inner end and the dolomite bank.

The Carnegie Steel Company, Youngstown, Ohio, construction was first installed in 1912, the next in 1914, and again in 1915, and has been in use continuously since the last date. The cooling devices were five in number, placed in the back wall, at the joint between the magnesite and silica brick, with a row of magnesite brick interposed between their inner ends and the inside of the furnace. The earliest form were rectangular square boxes, about 6 feet each in length, and placed apparently at the top of the dolomite bank, although some witnesses say they were in the slag zone. The later coolers were made of flattened pipe, but otherwise the construction and location were the same as the first installation.

The Jones & Laughlin Steel Company, Pittsburgh, construction was applied first in 1908 to the back walls of its tilted open hearth furnace, and has been used continuously ever since. Cooling devices were installed immediately below the tap hole at the top of the magnesite brick, with a course of chrome brick above them serving as a

neutral joint between the magnesite and silica brick. In form they are castings, with a 1½ or 2 inch pipe inside to furnish a circulating conduit for the water. They are not in the slag zone, except when the furnace is tilted to run out the molten metal.

The Carnegie Steel Company, Homestead, construction was installed in 1894 and was used only for a period of some eight or nine months. The coolers were five in number, located in the back wall similar to the disclosures of Knox patent No. 919,027. They were made of cast iron plate, about 2½ inches thick, corresponding to the thickness of an ordinary silica brick, with a pipe about 1½ inches in diameter bent to conform to the shape of the casting. At that date open hearth furnaces were constructed entirely of silica brick, because magnesite and chrome brick had not yet come into use. The lowest cooler was at the slag zone.

The furnaces in which these devices were installed were used publicly and openly in the manufacture of commercial steel. The witnesses uniformly say that they were successful and practicable, and assigned various reasons for the discontinuance for such as were discarded. Obviously, the benefits and advantages expected from these devices were not realized; otherwise their use would not probably have been discontinued in all cases because of the water trouble, or because of the other reasons assigned. The important consideration, however, is that persons skilled in the open hearth furnace art readily and naturally resorted to these devices to overcome difficulties inherent in the complicated problems arising in the manufacture of steel by the open hearth process, and made use from time to time of such devices, and installed and located them at the various places which, in their judgment, required protection from the destructive action of extreme heat.

In the light of this prior art, I am of opinion that it was not open to Naismith to claim as novel, or as his own, the broad idea of any shape or form of water cooler for an open hearth furnace, whether installed in the slag zone or at the joint of the silica and magnesite brick walls. His invention, if any there is, resides in the specific form of water cooler disclosed by his specifications and drawings, intended and designed to serve the purpose of a neutral joint in combination with other elements for supporting the silica side wall and making the coolers readily detachable and quickly removable in case of need. Claims 1, 2, 5, and 8 relied on, must be construed in connection with the drawings and specifications, and should not be given a construction broader than is necessary to protect Naismith's invention as thus specifically set forth and described. Defendant's construction is more nearly akin to the prior art than to Naismith's furnace; in fact, it does not seem to differ materially from some of the cooling devices of the prior art. If claims 5 and 8, the broad claims relied on, were to be given a construction broad enough to include defendant's cooling device, then, in my opinion, these claims would be thereby invalidated.

Plaintiff claims great commercial success for the Naismith invention, and invokes this success as a consideration making for the validity of his patent. In view of the fact that I am assuming the validity of the patent, and of the four claims sued on, this consideration becomes important only as it may tend to support a broad construction of the patent claims. The weight to be given commercial success in passing on the validity of a patent is well settled. It is important, and entitled to weight only when the question of validity is doubtful. Its weight in that event depends on whether or not the commercial success is due to the inherent merits of the invention, and is not the result of commercial methods of selling and exploitation. In this case it appears that Naismith's invention has been installed and used in the open hearth furnaces of the South Chicago plant of the Illinois Steel Company, a subsidiary of the United States Steel Corporation. It has not been installed and used in any other plant of the United States Steel Corporation. Naismith was superintendent of construction at that plant when this installation was made, and it was due, no doubt, to his personal efforts. Its success there has not led to its adoption at other plants of the United States Steel Corporation.

The plaintiff was incorporated to develop and sell the Naismith invention, and since then, by the usual selling methods, it has been sold and installed in five other plants. In these plants, however, one furnace only in each plant has thus been equipped, and of these five two only have so far been put in operation, owing to the depression in the steel industry. It also appears that in 1917 the Naismith cooler was installed, under Naismith's direction, in three furnaces of the Keystone Steel Company, Peoria, Ill., and after what a witness says was a fair trial the use thereof was discontinued,

because not found to be of any special benefit. This record is not sufficiently impressive to justify the giving of much weight to the claimed commercial success.

My conclusion is that defendant's construction does not infringe claims 1, 2, 5, and 8 of the Naismith patent; hence plaintiff's bill will be dismissed, at its cost.